
Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3456 | **DATE** | 4/21/2004 |
| **CASE TITLE** | Torain vs. Delta-T Group Illinois, Inc., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, defendants' motion for summary judgment is granted. Judgment entered in favor of defendants. Defendants' motion to compel and for extension of time to file joint final pretrial order is denied as moot. All future dates are stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | 2 number of notices | **Document Number** |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | APR 22 2004 date docketed | |
| | Notified counsel by telephone. | | | | 35 |
| | Docketing to mail notices. | | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | | |
| | Copy to judge/magistrate judge. | | | 4/21/2004 date mailed notice | |
| MD | courtroom deputy's initials | 2004 APR 21 PM 5:17 | Date/time received in central Clerk's Office | MD mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| SUSAN TORAIN, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 02 C 3456 |
| | ) | Judge Joan H. Lefkow |
| DELTA-T GROUP ILLINOIS, INC., an | ) | |
| Illinois Corporation, and DELTA-T | ) | |
| GROUP, INC., a Pennsylvania Corporation, | ) | |
| | ) | **DOCKETED** |
| Defendants. | ) | APR 2 2 2004 |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Susan Torain ("Torain"), brings this action against defendants, Delta-T Group

Illinois, Inc., an Illinois Corporation, and Delta-T Group, Inc., a Pennsylvania Corporation

(collectively "Delta-T") alleging (1) race discrimination; (2) gender discrimination; and (3)

retaliation, all under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1 *et seq.*[1]

Torain's First Amended Complaint also contains a claim for violation of the Illinois Wage

Payment and Collection Act, 820 ILCS 115/1 *et seq.*, over which this court has jurisdiction

pursuant to 28 U.S.C. § 1367. Before the court is Delta-T's motion for summary judgment. For

the reasons set forth below, the motion is granted.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and

---

[1]Torain also alleges race discrimination under 42 U.S.C. § 1981.

35

assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

Delta-T Group, Inc. is a Pennsylvania corporation engaged in the business of temporary staffing. (Def. L.R. 56.1 ¶ 1.) Delta-T Group, Illinois, Inc., is an Illinois corporation specializing in staffing the behavioral health, mental health and social work industry. (*Id.*) Delta-T Group, Inc. and Delta-T Group, Illinois are related by common ownership. (Def. L.R. 56.1 ¶ 2.) Delta-T Group, Inc. also maintains oversight management for all of its nationwide branch offices and affiliates, including Delta-T Group, Illinois. (Pl. Resp. to Def. L.R. 56.1 ¶ 2.) Torain is an African-American female who was hired to work for Delta-T Group, Illinois in March 2001 as a staffing coordinator. (Def. L.R. 56.1 ¶¶ 3, 5.)

At the beginning of her employment Torain received copies of the Delta-T Group Employee Manual, communications policy, and File Completion and Credentialing Policy. (Def. L.R. 56.1 ¶¶ 10-13.) Torain agreed to be bound by all of these policies. (*Id.*) In March 2001 she also entered into an Employment Agreement with Delta-T which stated, in pertinent part, that "Employee further agrees and promises to comply with and carry out those verbal directives that may be given to them by persons to whom Employee is accountable or who possess superior organizational jurisdiction over their position." (Def. L.R. 56.1 ¶ 13.) All of the following Delta-T employees had superior organizational jurisdiction over Torain: Michael Martin ("Martin"), who served as Affiliate Administrator and was Torain's direct supervisor; Pat Graff ("Graff"), Regional Affiliate Administrator and Martin's supervisor; Joanne McAndrews ("McAndrews"), Company President; Marlina Von Rohr ("Von Rohr"), Director of Human Resources; and Rachana Patel ("Patel"), General Counsel. (Def. L.R. 56.1 ¶¶ 6-9.)

Torain's duties as a staffing coordinator included processing and filling job orders, executing bulk scheduling, providing customer services to clients and contractors, administering new contracts, conducting file completion activities, administering new contractor interviews, and providing weekend and on-call services. (Def. L.R. 56.1 ¶ 23.) File completion, documentation and credentialing were all essential job duties for Torain and all other staffing coordinators. (Def. L.R. 56.1 ¶ 25.)

Torain's first performance review in her job was a "two-week follow-up" dated March 30, 2001. (Def. L.R. 56.1 ¶ 27.) This review rated Torain as "needs improvement" in the category entitled "Following Department Rules & Procedures." (*Id.*) On May 22, 2001, Torain received a written reprimand for staffing a contractor without any references during April 2001,

which violated Delta-T's File Completion policy. (Def. L.R. 56.1 ¶ 29.) On June 1, 2001,

Torain received her forty-five (45) day performance review. (Def. L.R. 56.1 ¶ 30.) This review

rated Torain as "needs improvement" in the following categories: (1) "displays understanding of

the importance of customer service"; (2) "implements management direction"; (3) "providing

self direction"; and (4) "following department rules and procedures". (Def. L.R. 56.1 ¶ 30.)[2]

This performance evaluation also specifically noted that Torain needed to improve her "file

completion," "follow through" and "organization." (*Id.*)

Torain received a number of other disciplinary notices thereafter, including

On July 24, 2001, Martin issued written discipline and counseling for Torain's failure to correctly fill out the Week-to-Week Tracking Log for the weekend of July 20-23. (Def. L.R. 56.1 ¶ 32.)

On August 14, 2001, Torain received a written warning for continuous violations of file completion and documentation policies, specifically for failure to document conversations with clients and contractors. This written warning stated that her supervisor, Martin, would monitor Torain's performance each day to ensure that all calls and conversations are documented as they happen. This written warning also expressly placed Torain on notice that if she continued not to perform satisfactorily or follow policies and procedures, she would be subject to additional discipline including but not limited to discharge. (Def. L.R. 56.1 ¶ 34.)

On August 20, 2001, Torain was verbally counseled for failure to properly document calls to clients and contractors in violation of policies and procedures. (Def. L.R. 56.1 ¶ 35.)

On August 24, 2001, Martin documented Torain's failure to properly validate and enter the schedule for J. Fuentes. Martin stated that he would re-check all of Torain's September schedules. (Def. L.R. 56.1 ¶ 36.)

Also on August 24, 2001, Torain received a written "Memorandum for Record" from Martin regarding her performance deficiencies. (Def. L.R. 56.1 ¶ 37.)

---

[2]Delta-T lists a number of other categories that allegedly were marked as "needs improvement." The court, however, on review of the June 2001 evaluation only sees the categories listed above as marked "needs improvement."

Torain was placed on final written warning dated September 6, 2001 for continued failure to properly document her communications with clients and contractors, in violation of company policies and procedures. The warning described a series of performance issues and violations. (Def. L.R. 56.1 ¶ 38.)

Torain received written counseling on September 11, 2001, for violation of the company file completion policy. (Def. L.R. 56.1 ¶ 40.)

Torain received written counseling on September 17, 2001, for errors committed on weekend "Alpha4" reports. (Def. L.R. 56.1 ¶ 42.)

These disciplinary measures notwithstanding, Torain points to aspects of her performance that she believes were impressive. For example, she testified (1) that she was successful in securing accounts with the University of Chicago and the Jane Adams Hull House (Pl. L.R. 56.1 ¶ ¶ 11-12); (2) that she "won" accounts with Guardian Angel House and Provena St. Joseph (Pl. L.R. 56.1 ¶ 13); (3) that she received a "Perfect Attendance" award for the second quarter of 2001 (Pl. L.R. 56.1 ¶ 14); (4) that she was one of only five employees nationwide who won Delta-T's "Bulk" award (Pl. L.R. 56.1 ¶ 15)[3]; and (5) that she maintained higher billable hours and average spread compared to fellow staffing coordinator Sean Jensen ("Jensen"), who is a white male. (Pl. L.R. 56.1 ¶ 16).

Martin testified that he and Graff had scheduled a meeting with Torain to take place September 18, 2001, in which they would discuss with Torain her performance since commencement of the final written warning period on September 6, 2001. (Def. L.R. 56.1 ¶ 45.) Torain, however, had already obtained approval of a vacation request from September 17, 2001

---

[3]Torain described this award as "where you try to get as many clients and get as many fills as possible" during a two-week span. (Torain dep. at 91.)

to September 21, 2001 for her wedding and was apparently not at work on the 18th. (Pl. Resp. to Def. L.R. 56.1 ¶¶ 45-46.)[4] Thus, she did not attend the meeting. (Def. L.R. 56.1 ¶ 46.)

Nevertheless, although she did not work on September 18, Torain did go to the office after hours. (Def. L.R. 56.1 ¶ 48.) She signed the security log and went to the office after nine o'clock at night.[5] (*Id.*) Torain claims that she went to the office at this time to pick up her wedding bonus. (Pl. Resp. to Def. L.R. 56.1 ¶ 48.) She acknowledges signing her arrival in the signature book but claims that she forgot to sign out. (*Id.*) Torain's name was signed in the signature book indicating that she left at 1:30 p.m. (*Id.*) Torain denies that the signature is hers. (*Id.*)

On September 19, 2001, at 9:33 a.m., Patel received an email from Torain in which Torain cited several specific email communications between Patel and Martin concerning Torain's performance. (Def. L.R. 56.1 ¶ 49.) Some of the cited emails had been sent with courtesy copies to various interested persons such as Graff, Von Rohr and McAndrews. (*Id.*) Torain was not a party to any of these emails. (*Id.*) Torain's September 19, 2001 email to Patel directly quoted email communications between Patel and Martin. (Def. L.R. 56.1 ¶ 50.) One such email was sent 16 hours earlier, at 5:22 p.m. on September 18, 2001. (*Id.*) Torain also quoted other emails dated September 6, 10, 12, 17 and two from September 18. (*Id.*) Torain's

---

[4]Delta-T urges the court to ignore the exhibit Torain attaches to her response which purports to establish that she was granted this vacation time. Delta-T submits that this document was never produced in discovery and the facsimile record shows that Torain's counsel received it on February 24, 2004. The court, moreover, certainly questions the accuracy of this document insofar as Torain's alleged vacation time is not mentioned at all in her deposition. However, at least for purposes of the September 18, 2001 meeting, the court accepts Torain's submission that she was on vacation time because that date is largely irrelevant for purposes of her termination.

[5]Torain had also signed into the office after 9 p.m. on September 9 and 13, 2001. (Def. L.R. 56.1 ¶ 48.)

performance was the subject of these email communications but, as noted above, she was never a party to them. (*Id.*)[6]

Although Torain never reported to anyone at Delta-T that she received copies of these emails (Def. L.R. 56.1 ¶ 58), in her deposition she testified that she received the emails anonymously on the night of September 18, 2001. (Def. L.R. 56.1 ¶ 53.) This is somewhat consistent with what Torain told investigators with the Equal Employment Opportunity Commission ("EEOC"). She told EEOC Investigator Andrew Daley that she received copies of the emails anonymously through the mail. (Def. L.R. 56.1 ¶ 54.) Daley testified that when he asked Torain how she was able to quote a September 18 email on September 19 if she received copies in the mail, Torain paused and told him that she received the emails via Federal Express delivery. (Def. L.R. 56.1 ¶ 55.) In her deposition Torain denied ever making the claim that the copies were delivered by Federal Express and stated that the copies were left on her doorstep in early September. (Torain dep. at 228.) Torain further admitted that it took her two weeks to read through all of the emails, despite the fact that she was able to quote one such email only hours after it was originally sent. (Def. L.R. 56.1 ¶ 57.)

After receiving Torain's September 19, 2001 email, Patel contacted Martin. At this point Martin had already noticed that his computer had been turned off, even though he only logged off his computer the night before. (Def. L.R. 56.1 ¶ 61.) After being contacted by Patel, Martin also discovered that all of his email communications to Graff, Von Rohr and/or Patel concerning

---

[6]As part of this litigation, Torain produced copies of dozens of emails and confidential documents to Delta-T and the Equal Employment Opportunity Commission. (Def. L.R. 56.1 ¶ 51.) She was neither the sender nor a recipient of any of the emails, none of which are dated after September 18, 2001. (*Id.*) Torain makes it a point to note that she was also in possession of emails that were in reference to other company individuals and that she was not made a party to such emails either. (Pl. L.R. 56.1 ¶ 25.)

Torain had been permanently deleted. (*Id.*) He also discovered that documents from employees' personnel files were missing. (*Id.*)

Martin testified that he had previously given Torain his computer password but had not authorized her to access his email account. (Def. L.R. 56.1 ¶ 59.) Torain, however, denies ever having Martin's password or accessing his email account. (Pl. L.R. 56.1 ¶ 24.) Patel testified that the Delta-T Group Information Services Department confirmed that someone accessed Martin's computer on the evening of September 18, 2001, apparently from an off-site location. (Pl. Resp. to Def. L.R. 56.1 ¶ 60.)

On September 19, 2001, another meeting was scheduled for Torain with Martin, Graff, Von Rohr and Patel. (Def. L.R. 56.1 ¶ 62.)[7] Martin called Torain into his office for what would be a conference call meeting. (Torain dep. at 230.)[8] The conference call was to include Graff, Patel and Von Rohr. (Def. Ex. H at 000239.) Torain refused to enter Martin's office or talk to the people on the phone. (Torain dep. at 230-31.) In her deposition Torain stated that

> Mike came to my desk and said that Rachana's on. I said, "I already told you before, according to my e-mails, that I do not want to talk to them." He said, "If you don't get on the call, they're going to fire you." I said, Then Mike, you need to do your job and fire me."

(Torain dep. at 230-31.)

---

[7]Torain denies defendants' statement of material fact number 62 on grounds that she was scheduled to be on vacation on September 19, 2001. The denial is baseless. Torain's deposition testimony is quite clear that she attended work that day:

Q: You came in to work on September 19, right?
A: I did.

(Torain dep. at 229.)

[8]Neither party detailed the September 19 meeting in their respective statements of fact. The court, therefore, cites directly to record.

Since Torain would not attend the conference call meeting in Martin's office, a call was placed to her by Patel, Von Rohr and Chris McAndrews, Delta-T's Executive Vice President. (Def. Ex. H, 000242.; Graff dep. at 83.) Torain's deposition details the rest of the phone conversation:

> Q: And you were asked, on the 19th, how it was you came to receive the e-mails that you had quoted in your September 19th e-mail to Rachana, right?
> A: Yes
> Q: And you did not tell anyone that you received them anonymously?
> A: I didn't say anything on the telephone call.
> Q: You did not tell them that you received the e-mails anonymously?
> A: Correct, I didn't say anything on the call.
> Q: This is a yes or no.
> A: No.
> Q: So you did not tell them that you received them anonymously–
> A: No.
> Q:–that's correct, right?
> A: That is correct.
> Q: And at some point you received a call at your desk from these individuals, right?
> A; Yes, I did.
> Q: Tell me what was said in that conversation.
> A: They just said as of a particular time– I don't recall the time–you will be terminated. I said, "Sounds good."
> Q: That's it?
> A: That's it that I recall.

(Torain dep. at 232-33.)[9] Torain admits that she never told anyone at Delta-T how she came into possession of the private emails between Martin and Patel. (Def. L.R. 56.1 ¶ 64.)

There is some confusion in the record as to the exact reason why Torain was fired. Martin testified that Torain was fired for "[f]ailure to comply with company standards" and

_____

[9]Torain denies that she was given the opportunity to explain how she accessed the private emails between Patel and Martin. Her citation to the record consists of the following: (Def. Ex. C at 75-76; Pl. Ex. __.) The court examined Def. Ex. C at 75-76. This is deposition testimony from Martin. While he states that Torain refused to come into his office for a conference call meeting, he does not say that Torain was never asked about the emails. The court apparently is left to only guess as to what "Pl. Ex. __ " is. Moreover, once again, Torain cannot escape her own deposition testimony listed above in which she specifically said that she was asked about the emails.

specified that issue of the emails had "no relevance to her termination." (Pl. Resp. to Def. L.R. 56.1 ¶ 65 (citing Martin dep. at 60, 67).) Patel and McAndrews, however, both clearly stated that Torain was terminated for refusing to participate in the September 19, 2001 meeting and for unauthorized access to and misappropriation of company emails. (Def. L.R. 56.1 ¶ 65.) Moreover, in a September 19, 2001 letter from Patel to Torain memorializing Torain's termination in writing, Patel once again clearly states that Torain was fired for not taking part in the September 19 meeting and for refusing to tell how she accessed her supervisor's email account. (Def. Ex. K at 000776.)

Torain claims that she was treated differently from other employees based on her race and/or sex in a number of regards. First, she claims that she was regularly given "priority lists" during her job while others were not. (Def. L.R. 56.1 ¶ 74.) A priority list is a list of tasks to be accomplished. (*Id.*) It is normally prepared by a supervisor in order to help a staffing coordinator meet the employer's expectations and to bring him or her to the acceptable level of proficiency. (*Id.*) Torain also alleges that she was required to meet regularly with Martin and/or Graff even though she believes other staffing coordinators did not have to do so. (Def. L.R. 56.1 ¶ 80.) In addition, Torain testified that Martin and/or Graff accompanied her on client visits, but they did not escort other staffing coordinators on such visits. (Def L.R. 56.1 ¶ 88.) Moreover, she contends that Steve McArtin ("McArtin"), Wage & Benefits Administrator, discriminated against her because she had to follow-up with him to get her wedding bonus. (Def. L.R. 56.1 ¶ 94.) She received this bonus on September 18, 2001, three days after her wedding. (Def. L.R. 56.1 ¶ 95.) Torain believes that this was not quick enough and that she did not receive the bonus sooner because McArtin is Caucasian. (Def. L.R. 56.1 ¶ 96.) She points out that Jensen received

his wedding bonus one month before his wedding. (Pl. L.R. 56.1 ¶ 22.) Torain also claims that

Martin "possibly" deleted entries from her computer database because of her gender and race.

(Def. L.R. 56.1 ¶ 108.)

Torain further complains of discrimination by various members of Delta-T's staff. She

testified that on two or three occasions Graff stood very close to her desk and watched her

working over her shoulder based solely on Torain's race and sex. (Def. L.R. 56.1 ¶ 98.) Torain

also testified that Graff stated in May 2001 that Torain was a "skinny little black girl" and in June

or July 2001 Graff said "something to the effect" of "skinny little black girl." (Def. L.R. 56.1 ¶

100.)[10] Torain alleges that Patel discriminated against her by recommending that Martin

discipline Torain for poor performance. (Def. L.R. 56.1 ¶ 112.) Torain also alleges that Patel

retaliated against her by telling Martin to write her up. (Def. L.R. 56.1 ¶ 123.) For McAndrews,

Torain alleges that she was treated less favorably based on her race and sex because McAndrews

failed to respond to an email and failed to "follow up." (Def. L.R. 56.1 ¶ 114.) Torain

complains that Von Rohr treated her less favorably based on her race/sex because Von Rohr

failed to do anything after Torain complained to Von Rohr. (Def. L.R. 56.1 ¶ 116.)

## DISCUSSION

Before addressing Torain's claims, the court must clarify a few points. First, on January

20, 2004, Delta-T's motion to strike all claims of sexual and racial harassment from the First

Amended Complaint was granted. This was consistent with representations Torain and her

counsel gave to Delta-T and its counsel that Torain wished only to proceed on theories of race

and sex discrimination and not theories of harassment, which would include any claim for a

---

[10]Graff denies making either statement. (Graff. dep. at 65.)

racially or sexually hostile work environment. Thus, in accordance with the January 20, 2004 minute order, the court analyzes Torain's claims under theories of discrimination and not harassment.

Second, in support of her race discrimination, sex discrimination and retaliation claims, Torain is required to establish that an adverse employment action took place. An adverse employment action is something

> more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other indices that might be unique to a particular situation.

*Hildebrandt* v. *Illinois Dep't of Natural Res.*, 347 F.3d 1014, 1034 n.13 (7th Cir. 2003) (quoting *Traylor* v. *Brown*, 295 F.3d 783, 788 (7th Cir. 2002)). An adverse employment action would not include inconveniences or events that "make . . . an employee unhappy." *Smart* v. *Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). Instead, "an employee must show that 'material harm has resulted from . . . the challenged actions.'" *Traylor*, 295 F.3d at 788 (quoting *Haugerud* v. *Amery Sch. Dist.*, 259 F.3d 678, 692 (7th Cir. 2001)).

In this case Torain points to a number of alleged discriminatory acts that clearly do not qualify as adverse employment actions. For example, being given priority lists, attending regular meetings, being asked trivial questions, being accompanied on client visits or even getting her wedding bonus three days after her wedding did not result in material harm to Torain nor could such events be construed as affecting her salary, position or employment. Accordingly, the court will not consider these events themselves as being adverse employment actions.

Finally, in light of the conclusion above that the acts previously listed are not adverse employment actions, Delta-T submits that Torain's claims fail because she has never complained that her termination was the result of race or sex discrimination. An examination of her First Amended Complaint perhaps supports such a theory because it never does mentions that Torain was fired based on discrimination and instead only speaks of "different terms and conditions of employment." Nevertheless, the court will examine whether the termination was discriminatory in this case.

## A.     Race Discrimination

A plaintiff may establish race discrimination under Title VII[11] through either direct or indirect proof. *Bennett* v. *Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). Torain attempts to proceed under each theory.

### 1.     *Direct method of proof*

Under the direct method of proof, Torain must establish through either direct or circumstantial evidence that "the employer's decision to take the adverse job action was motivated by an impermissible purpose, such as her race . . . ." *Adams* v. *Wal-Mart Stores*, 324 F.3d 935, 938-39 (7th Cir. 2003). For a statement to suffice under the direct method of proof, it must have a degree of content that reflects discriminatory animus, it must have been made by a decisionmaker and it must be related to the action at issue. *Sanghvi* v. *St. Catherine's Hosp.*, 258 F.3d 570, 574 (7th Cir. 2001). Torain argues that circumstantial evidence sufficient to satisfy the direct method of proof is present based on Graff's comments to Torain that she was

---

[11]Claims under Title VII and 42 U.S.C. § 1981 are analyzed in the same manner. *E.g., Logan* v. *Kautex Textron N. Am.*, 259 F.3d 635, 637 n.1 (7th Cir. 2001).

13

a "skinny little black girl" combined with Martin's special priority lists given to Torain on a daily basis. According to Torain, this evidence is "strongly connected" to her termination.

Starting with the "skinny little black girl" comment, the court, drawing all inferences in Torain's favor, assumes for purposes of this motion that Graff's statements reflected discriminatory animus. Nevertheless, the two other conditions necessary for these statements to constitute direct evidence of discrimination are not met. For example, there is no dispute that this comment was not made contemporaneously with or anywhere near Torain's termination. On the court's review of the record, it appears as if the two comments were made in March and June/July, months before Torain was terminated. Moreover, it does not appear that Graff was the decisionmaker in this case. Graff testified that she had gotten off the phone prior to the conversation between Torain, Patel and Von Rohr in which Torain refused to explain how she obtained the confidential emails. (Graff dep. at 82-83.) In addition, evidence in the record suggests that the termination decision was made by Patel, Executive Vice President Chris McAndrews and President Joanne McAndrews. (Def. Ex. K at 776; Def. Ex. V., McAndrews Aff. ¶ 13.) At best there was a series of decisionmakers and no evidence exists that Graff's statements otherwise influenced the viewpoints of the other decisionmakers.

Perhaps in anticipation of Graff's not being considered a "decisionmaker," Torain cites *Russell* v. *Board of Trs.*, 243 F.3d 336 (7th Cir. 2002) and *Maarouf* v. *Walker Mfg. Co.*, 210 F.3d 750 (7th Cir. 2000), in support of her argument that a racially hostile co-worker can be shown to have influence on the decisionmaker so that a co-worker's bias can be imputed to the employer. The scenarios in those cases, however, are not similar to that present here. Indeed, the court in

*Maarouf* explained that the principle of a co-worker's bias being imputed to an employer was applicable where

> the subordinate, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision . . . . In such a case, the discriminatory motive of the other employee, not the autonomous judgment of the nondiscriminating decision-maker, is the real cause of the adverse employment action. If the other employee merely utters a hostile stereotype, he is not manipulating the decision.

210 F.3d at 754. Even after viewing the facts in a light most favorable to Torain, the court agrees with Delta-T that Torain has presented absolutely no evidence that Graff attempted to influence the decision to terminate Torain or that she otherwise concealed any relevant information. Moreover, combining Martin's special priority lists adds little to this analysis.

Therefore, for all the above reasons, Torain's attempt to proceed under the direct method of proof fails.

2.    *Burden Shifting Method*

Under the burden-shifting method established by *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973), Torain bears the initial burden of producing evidence to sustain a *prima facie* case. If Torain meets this burden, then Delta-T must produce a legitimate, nondiscriminatory reason for its action. If Delta-T offers a legitimate nondiscriminatory reason, the burden then shifts back to Torain to present evidence that the employer's proffered reason is pretextual. *E.g.*, *Adams*, 324 F.3d at 939-40; *Sanghvi*, 258 F.3d at 577.

To satisfy a *prima facie* case of race discrimination, Torain must show (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was meeting her employer's legitimate performance expectations; and (4) that the employer treated

15

similarly situated employees who are not in the protected class more favorably. *E.g.*, *Gordon* v. *United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001). Factor (1) is undisputed and the court assumes that factor (2) is satisfied by Torain's termination. Delta-T challenges whether Torain can establish factors (3) and (4).

Based on the undisputed facts in the record, Torain was not meeting her employer's legitimate performance expectations. While this may not be a high standard to meet and only requires "some evidence" that Torain was meeting Delta-T's legitimate performance expectations, *see Johnson* v. *Zema Systems, Inc.*, 170 F.3d 734, 743 (7th Cir. 1999), the record is replete with evidence of Torain's not performing aspects of her job adequately. Beginning when Torain was hired up until when her employment was terminated, there was a continuing stream of disciplinary notices on major aspects of her job, including her "file completion," which Torain herself admits was an essential job duty for a staffing coordinator. Moreover, these concerns where listed in all of her performance reviews, including her March 30, 2001 review and her June 1, 2001 review. These performance reviews, disciplinary notices and written warnings finally culminated in a "final written warning."

While Torain states that she had perfect attendance, won a "Bulk" award, and was successful in obtaining new clients, at best this only suggests she adequately performed certain parts of her job. The evidence in the record taken as a whole, however, clearly shows performance problems for which Torain was put on notice throughout her employment at Delta-T. In addition, as for the requirement that a similarly situated employee be treated more favorably, Torain is unable to cite to a similarly situated employee who was believed to have performed actions similar to those here involving misconduct comparable to misappropriation of

16

confidential emails. Thus, based on all of the above, Torain has failed to satisfy her *prima facie* case and Delta-T's motion for summary judgment is properly granted as a result.

Even assuming that Torain could make out a *prima facie* case of race discrimination, however, Delta-T has brought forth legitimate and nondiscriminatory reasons for Torain's termination and she has failed to establish that these reasons are pretextual. According to the decisionmakers who fired Torain and the documentation provided to her concerning the termination, she was fired because she would not participate in the meeting scheduled on September 19 and because she failed to provide any explanation as to how she obtained the emails between, among others, Patel and Martin. Torain argues that these reasons are pretextual because (1) Martin testified in his deposition that she was fired because of lack of file completion and not because of the September 19 meeting or anything regarding the emails and (2) she did not break into Martin's computer and did not access his emails.

To meet her burden of showing pretext Torain must bring forth evidence establishing that the reasons articulated by Delta-T were not its true reasons for terminating her but instead were dishonest explanations unworthy of credence. *Zaccagnini* v. *Chas. Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003); *Peters* v. *Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002). Torain's first pretext argument–that Martin gave a reason for Torain's termination that differed from the reasons set forth by Martin's superiors–apparently means to rely on the theory that inconsistent reasons for a termination raises a question on pretext. *E.g.*, *Perfetti* v. *First Nat. Bank of Chicago*, 950 F.2d 449, 451 (7th Cir. 1991). The court, however, does not believe that Martin's testimony is sufficient to show pretext for a number of reasons.

Initially, similar to Graff above, Martin was not one of the decisionmakers concerning Torain's termination. While he did serve as her supervisor, he was not on the phone for the conference call meeting in which Torain was confronted with the question of the emails.[12] Furthermore, Martin's testimony in his deposition is against the vast weight of all the evidence in the record. Every Delta-T decisionmaker taking part in the meeting was clear that the reason for Torain's termination was her failure to take part in the meeting and her failure to confront the issue of the confidential emails. (Def. Ex. I, Patel Dep. at 9-10, 21-22, 27; Def. Ex.V, McAndrews Aff. ¶ 13.) This is also consistent with documentation for the termination that Patel, on behalf of Delta-T, mailed to Torain. (Def. Ex. K, at 000776). In short, Martin's deposition testimony is merely a scintilla of evidence and insufficient to meet Torain's burden of establishing pretext.

Torain's second pretext argument–that she did not access Martin's computer or take his emails–is irrelevant. Delta-T need only provide a honest reason for the termination not necessarily a correct one. *See, e.g., Flores* v. *Preferred Technical Group*, 182 F.3d 512, 516 (7th Cir. 1999) ("employer only needs to supply an honest reason, not a reasonable one."); *Gustovich* v. *AT & T Communications*, 972 F.2d 845, 848 (7th Cir. 1992) (plaintiff's actual performance as an employee is irrelevant because the question is not whether the employer's reasons for a decision are "*right* but whether the employer's description of its reasons is *honest*.") (emphasis in original). While Torain may stand behind her theory that these emails were mailed

---

[12]In a "Manager's Separation Report" and "Memorandum for the Record" written by Martin, he confirms that he was standing behind Torain while she was on the phone with Patel, McAndrews and Von Rohr and that he could only hear Torain's side of the conversation. Moreover, Martin stated that after Torain hung up, she began to pick up her personal belongings and gave him her office key. (Def. Ex. H 000239-000242.)

to her at home, there is no evidence to suggest that Delta-T did not honestly believe that Torain had misappropriated the emails and improperly accessed her supervisor's computer. Indeed, when given the chance to explain her possession of the confidential information to her supervisors, Torain did not even advance the theory she supplies here.

Accordingly, based on the above, Torain is unable to create a triable issue of fact under the burden shifting method. Delta-T's motion for summary judgment on Torain's race discrimination claim, therefore, is granted.

## B.    Sex Discrimination

Torain appears to abandon her sex discrimination claim by not mentioning it in her response brief. In any event, under Title VII an employer cannot "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e2(a)(1). To prevail on a claim of sex discrimination, Torain would have to show that Delta-T intentionally discriminated against her. *Kormoczy* v. *Sec'y U.S. Dep't of Hous. and Urban Dev.*, 53 F.3d 821, 824 (7th Cir. 1995). She may do this through either direct or indirect proof. Although Torain does not specify, since she points to no direct evidence in the record, the court presumes that she proceeds under the indirect method of proof.

The indirect method of proof is the same burden-shifting approach detailed above for Torain's race discrimination claim. Torain's claim fails for the same reasons listed above. She cannot make out her *prima facie* case because she was not meeting her employer's legitimate performance expectations and cannot point to a similarly situated employee. Moreover, even if

19

she could make out a *prima facie* case, she cannot meet her burden to show pretext. As such, summary judgment is granted in favor of Delta-T on Torain's claim for sex discrimination.

**C.     Retaliation**

It is unlawful for an employer to discriminate against an employee for opposing a practice made unlawful under Title VII. 42 U.S.C. § 2000e-3(a). To prove a case of retaliation, a plaintiff must establish by a preponderance of the evidence (1) that she opposed an unlawful employment practice; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was caused by her opposition to the unlawful employment practice. *David* v. *Caterpillar, Inc.*, 324 F.3d 851, 858 (7th Cir. 2003). An employer's intent to retaliate may be proven either directly or indirectly. *Id.* Once again, Torain fails to bring forth evidence under the direct method, so the court assumes that she proceeds under the indirect method of proof.

Under this method, a plaintiff must show (1) that she engaged in a statutorily protected activity; (2) she was subjected to an adverse employment action; (3) she was performing her job in a satisfactory manner; and (4) she was treated less favorably than any other similarly situated employee who did not engage in such protected activity. *Brown* v. *Chicago Sun-Times, Inc.*, No. 00 C 6728, 2002 WL 31844984, at *5 (N.D. Ill. Dec. 17, 2002) (*citing Stone* v. *City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002). If Torain establishes a *prima facie* case of retaliation in this manner, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, [it] is entitled to summary judgment. Otherwise, there must be a trial." *Id.* (*quoting Stone,* 281 F.3d at 644). Under this

20

method, establishing a causal link between the protected expression and adverse employment action is not required. *Id.*

Rather than spell out in her brief what her protected activity was, Torain suggests that certain "incidents" (apparently including the requirement that she be given priority lists) resulted in her termination. The court fails to see, and Torain does not make clear, how any of this makes for retaliation. *See Clay* v. *Holy Cross Hosp.*, 253 F.3d 1000, 1002 n.1 (7th Cir. 2001) (noting that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

Torain also argues that she complained to management about discrimination and nothing was done. The court will assume that this satisfies element (1) of Torain's *prima facie* case. Nevertheless, similar to her race discrimination claim, Torain cannot establish that she was performing her job in a satisfactory manner and is unable to point to a similarly situated employee treated more favorably who was did not engage in the protected activity. And even if she could, she is still unable to establish that Delta-T's reasons are pretextual. As such, Delta-T's motion for summary judgment is granted on Torain's retaliation claim.

## D.  Wage Payment and Collection Act

Torain's last claim arises under the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et. seq.* In her First Amended Complaint Torain alleged that Delta-T has withheld $1,599.98 in regular wages, $369.21 in vacation pay, and $568.19 in bonus pay. In its motion for summary judgment Delta-T argues that the Employment Agreement between Torain and Delta-T specifically provided that Pennsylvania law would apply and, therefore, Torain's claims under

the Illinois Act must fail. Torain fails to respond or even mention her claim under the Illinois Wage Payment and Collection Act in her brief, and the court, therefore, views her undeveloped claim as waived. *See Clay*, 253 F.3d at 1002 n.1. As such, Delta-T's motion for summary judgment on this claim is granted.

## CONCLUSION

For the reasons stated above, Delta-T's motion for summary judgment is granted [#26]. The clerk is instructed to enter judgment in favor of the defendants. This case is terminated.

Enter:  _Joan H Lefkow_
        JOAN HUMPHREY LEFKOW
        United States District Judge

Dated: April 21, 2004